I want to address two issues this morning. First, the denial of the new trial motion, and second, the sentencing. And reserve one minute for rebuttal. After the trial in this case, for the first time, the mastermind, by all accounts, Robert Tefengtian, spoke with defense counsel and stated that Ms. Cameron wasn't responsible, had nothing to do with this crime. Tefengtian was the one who recruited all the conspirators and was the one that had full knowledge of the conspiracy. They submitted this information with respect to and in support of a motion for a new trial. The district court denied it, basically on the rationale that any time a co-defendant comes forward after trial and after sentencing and says, hey, I can testify now, that testimony is inherently unreliable and inherently suspect. Scalia. Did he testify at trial? Cameron No, he did not. He pled guilty. Scalia. Oh, he pled guilty. Cameron Yes. Scalia. And remind me, what was the relation of his guilty plea to her trial? Cameron I believe it was on the morning of trial or shortly before the trial, in terms of timing and such. Scalia. So they were scheduled to be tried together? Cameron Actually, you know, I wasn't trial counsel, but it was somewhat in advance of trial, I believe. Kennedy. So before she goes to trial, he pleads guilty, but he isn't he still has a privilege, obviously, because there's been no judgment of conviction entered and no sentence. And so did anybody try to call him? Did defense try to put defense counsel submitted a declaration in connection with the motion for a new trial detailing that they tried to contact him and were unable to because counsel prevented it. Counsel for defension prevented it and wouldn't allow the contact. Kennedy. He wasn't subpoenaed. Cameron No, he was not subpoenaed. I understand that he could get on the stand and be and claim his privilege. But I'm asking a different question. He wasn't subpoenaed to be present at a trial. And there was nothing that prevented that. No. Kennedy. I'm not saying it needed to have been done. I'm just saying factually there's nothing that prevented that. Cameron That's correct. Kennedy. And there's nothing factually or legally that would have prevented the defense from putting in the witness stand and forcing him to take the fifth. Cameron Well, I believe in view of his counsel's stated intention that he was going to take the fifth, certainly would have been within the judge's discretion to preclude that on the stand in front of the jury. Certainly that could have been done outside the presence of the jury. Kennedy. I see. So you're saying that the the if there had been an objection to something like that, the district judge could have said, well, rule on that outside the presence of the jury. But of course, the government might not have objected. I mean, I don't know whether they would have or not. But the point is, he was not brought into the courtroom. He was not put on the stand. He was not asked any questions. He did not, in fact, invoke the fifth. All we know about that is that his lawyer or rather your client's lawyer, which was not you, the car lawyer, files a declaration saying I this is what I try. I talk to I talk to him. I talk to a defense lawyer. And he said he he the lawyer said that the court offendant will not testify. OK, I just want to make sure I and I and I understood you think that's enough to to to trigger. A newly discovered evidence, I mean, you think defense should have enough, I believe so, Your Honor. The law doesn't require idle acts, and it would seem that you haven't been surprised in the courtroom. Pardon? You ever been surprised in the courtroom? Certainly. I think I heard a laugh from the trial judge here. Certainly they're surprised. I'm not being facetious. I'm just saying, you know, in a sense, you don't know for sure what's going to happen until you, you, you, you. Maybe it's close enough. But I sort of in my mind, as I as I think about it and trying to figure out whether the district court here, you know, abused its discretion, whether you know to what extent we can feel. It's very easy afterwards to say, you know, I would have done this. I would have testified as follows. You know, it's sort of a fairly easy thing to say. But he he didn't he wouldn't be exposing himself to any perjury because he hasn't testified before. So well, that's that's actually the key point in this case, Your Honor. He would have been exposing himself to some perjury prosecution because he entered into a plea agreement where as the factual basis of the plea named or not named, but identified Miss Cameron, not by name, but by position as being involved in this conspiracy. So if he did subsequently testify under oath that she was not, that would be inconsistent. And certainly the government would have a good case for perjury prosecution. For what would the perjury be? The perjury would be some of the plea agreement was. He has two statements which you say are inconsistent. That's correct. Okay. Which one would be subject to a prosecution of perjury in your view? I think the maybe in my view, the one that would be subject to perjury would be the one in the plea agreement. I'm sure the government might take the view that the testimony at trial would be the one subject to perjury. Well, let's talk about that. Is a plea agreement a something for which you can be subjected to perjury, signing a plea agreement? I think the plea agreement was signed under penalty of perjury. You think? I think. Do you know? I confess I don't know for sure. I don't have the plea agreement in front of me, but I believe it was. You want to go get it and take a look at it? Let me know. Sure. Do you have it right there? I guess what I'm asking you specifically, what is in the plea agreement that he could have, he charged with, I mean, what's the specific statement? What did he swear to? I mean, very often plea agreements are quite vague. I mean, they recite facts, but I don't think people actually subscribe to them as the way they would to testimony. Well, you want to think about it? Yeah, I'll take that opportunity, Your Honor. Unless there are questions, I want you to reserve the time for a button. Very well. And we'll hear from the government. May I proceed? Please. May it please the Court, Peggy and Ryan for the United States. The Ninth Circuit has long held that co-defendants who choose not to testify at their other co-defendant's trial and subsequently come forward after sentencing to offer exculpatory testimony is not newly discovered evidence. This case is in all fours with Reyes Alvarado. There is no factual distinction between this case and that. The defendant is trying to make much of the fact that in the plea agreement, he identified a bank insider who was his co-defendant. That defendant was not named. He was named Christina Cameron, and the government, as Judge Kaczynski points out, would have difficulty in bringing a perjury prosecution in choosing which statement was false and which statement was the, in fact, the true inconsistent statement. It is, of course, the government's position that any testimony offered at trial that a defendant Cameron was not involved would be the perjurious statement. That we would use his plea agreement plus the evidence presented at the trial of the bank employees who inculpated defendant Cameron would indicate that the perjurious statement is the newly offered testimony that the defendant is asking to receive a new trial in order to offer. So it goes back to the ---- Kennedy, why do you think this co-defendant, I mean, I guess it's not, I guess it's a co-defendant. Even though they weren't tied together, they were charged together. Why do you think the co-defendant comes forward and now claims that Cameron was a stooge? Your Honor, I suspect the co-defendant had some guilt after the fact of having inculpated the co-defendant, Cameron, in his plea agreement. He did not approach the defense. The defense approached him. And in an interview, he said, sure, she had nothing to do with it. These 140 phone calls in the month of January were strictly social and or business calls. You know, she had not ---- And hang-ups. And hang-ups. She had nothing to do with it. And, boy, I'd like to testify, but I'm a little concerned that now telling the truth, quote, unquote, might have negative impact for me. That's not a defendant coming forward and saying, I really have new evidence, this person is innocent, and a misjustice has been carried out. That's someone feeling a little bit guilty after the fact and trying to take the blame for himself, because, after all, he's got nothing to lose. He's been sentenced. He can't be retried for this offense. He can't be resentenced for this offense. And that is exactly why the Ninth Circuit has long cautioned that testimony ---- He can't buy himself anything good by testifying for the defendant. He can only get himself into trouble. I just don't see, unless it's really the truth, I mean, what would he feel guilty about? Unless he really implicated an innocent person. I mean, it is a little troubling to ---- You don't think this trial would have played out differently if he had testified and said, look, she was a stooge. I had almost 150 phone calls. We never discussed any of this. It was all social or hang-ups and all that. I ---- No, Your Honor. I believe your question has two parts. And the first part is, why has he come forward? And I think it's critical to remember that he hasn't. He has not unequivocally offered to testify. He has given vague statements and said, well, gosh, maybe I'd like to, but I'm not sure. That is simply not the sufficient showing required by the Ninth Circuit in a motion for a new trial. And the second part is, would this new evidence likely result in an acquittal? And the answer is no. If we look at the evidence presented at trial, we had bank employees, the coworkers of the defendant, who identified her as the primary bank employee who helped with an attempted fraud two weeks before the actual fraud, the case of the imposter coming in, trying to withdraw $370. But that does not exclude a stooge defense. I mean, that's the nature of being a stooge. You do the work of the bad guys, thinking you're doing something else, and you do it maybe very effectively. But it doesn't tell us anything at all about whether she did it for innocent reasons or for criminal reasons, does it? Your Honor, if she were a stooge, her subsequent behavior would have played out differently. It isn't the case that this was one attempt that went bad. After this one attempt was defeated by a coworker who used good judgment and caution, the defendant had every reason to act with caution and protect the bank client. She didn't. She allowed this nephew to come in 10 days later. She did not seek out the assistance of this other bank employee who had the good sense to use caution and protect the bank employee. Instead, she went directly to the teller line of a brand new employee, someone who had been there only three or four months and was not likely to question her judgment. She then authorized each and every single one of these transactions. And it's critical to remember that when... I mean, I guess I don't understand how that proves her motives. I mean, she might have done all these things if she was a stooge. I mean, if she really is a stooge, she believes what she's doing is legitimate because this guy lied to her. I don't know how her persistence or her efficiency tends to prove that she had a criminal mental state. Judge Kuczynski, if you recall, after the fact, when she was interviewed by the FBI, she repeatedly lied about her conduct. And that is incredibly telling about her intent at the time. She stated that everyone was in agreement with her choice to go forward with the cash transaction except Decker, her immediate supervisor, who forbade it. In fact, everyone told her not to. She lied to cover up her offense. She also said she didn't know Mr. Tefancion except through the bank, through their customer service relationship. After she was showed the phone records, she agreed, okay, we had a social relationship too. She said that the imposter who came in presented five forms of identification. In fact, only two were presented. She said that she checked with the LAPD to make sure this customer was up and up. She refused to reveal the LAPD officer. She supposedly spoke to, and in fact, she did nothing to investigate the legitimacy of this imposter as the evidence proves out. Her lies indicate her intent and indicate her intent to cover up her behavior after the fact. This is not someone who behaved unwittingly. This is someone who knowingly participated in the offense. She defied a direct order by her supervisor who forbade her from trying to go forward with this cash transaction. And she did it anyway and lied to that supervisor while she was doing it. Was there any evidence? Ms. Rhyne, Ms. Rhyne, before we get to the end of your total time, I would appreciate it if you would address the sentence. Yes, of course, Your Honor. Like, I will just tell you, I have no real issue with the new trial motion, but I have a major issue with the sentence, with whether the judge gave adequate reasons. Under Nose is Gun, he doesn't, the judge doesn't have to go through all the 3553 factors, but I have the impression here the judge didn't really give any reasoned statement for the sentence. Your Honor, it is true that at the time of pronouncement, the judge did not list out his reasons for giving a sentence. But what is also clear, that there was an ongoing dialogue during the sentencing hearing, during which there were in fact two hearings and a series of briefings requested by the court. The court listened to the defendant's arguments for leniency, listened to her 3553 arguments, and told the defendant specifically he rejected two of them. He did not believe she was a minor player, and he did not believe that she was naive, trusting, and taken advantage of by her co-defendants. He skipped over and did not address what I consider and what the court apparently considered to be non-meritorious arguments, the fact that she lost her banking career because she was a branch manager who defrauded her own bank, and that she chose to abort a pregnancy while this case was pending. Those are clearly, in my mind, arguments that didn't require the court to assess them. I understand that argument, but I still have some difficulty with whether the standards that should be set under Booker for a reasonableness assessment require that we have some sort of statement of reasons from the judge, and the questions aren't really reasons, or comments that a judge makes during argument of someone. You can't necessarily equate that with the reasons the judge has reached. Judge Kaczynski may ask you hard questions and ask your colleague on the other side hard questions. I won't really know what his reasons and his thoughts are until conference, so I have difficulty just taking that colloquy. And Ms. Ryan, on top of that, connected to Judge Gould's question, are you arguing here that since the court listened to the statements made by counsel on his client's behalf, and then at the same time basically departed from the bottom of the standard advisory guideline range, can we use that to find reason? First, I'll address Judge Gould's question, then I'll get to yours, Judge Martinez, if that's all right. Your Honor, I understand the court's concern about the lack of a recitation of reasons, and certainly the record in this case could have been better, but Booker only requires that the court consider the 3553 factors and consider the guidelines. And there are a number of- The court- Right, I agree with that. And we said that in Nose's Gun. If the judge had said, I have considered all of the factors under Section 3553, and here's my sentence, that would be a little different than when the judge just listens to argument about those factors. Your Honor, there are- That's my concern. I appreciate your concern, and I think the guidance we have in a case like this, where courts have been struggling as to the proper way to comply with Booker and the proper record to be made, this case was sentenced last July when guidance was still being determined by the higher courts. And I think in the record that we have before us, the critical question as the Seventh Circuit set forth in Cunningham is whether by the record itself this court has enough to see that the district court actually considered and reviewed the factors as required by Booker. And whether or not there's a sufficient record for this court to review the reasonableness of the sentence. And that goes to Judge Martinez's question is, is the fact that this is a below-guideline sentence, the court in fact listened to the defendant's arguments, asked where the co-defendants had been sentenced, and then departed downward from the guideline range to impose a sentence between her two co-defendants. It's clear that this record before this court is sufficient for this court to decide whether or not that sentence is reasonable. And in this case, we do know that we have a branch manager who facilitated a $500,000 fraud on her own bank. She received a 36-month sentence. The defendant herself does not argue that this was not a reasonable sentence. And the record before this court is sufficient for it to find that this is a reasonable sentence. Let me ask, unless there's Google, does Martinez have a follow-up question? Because I don't want to change the subject. I'm sorry, I do want to change the subject. No, that's an adequate answer that I've gotten to my question. Just a little bit. You waved aside in answering Judge Bluth's first question, her pregnancy and the fact that she lost her job. Now, I don't have any question about the pregnancy, so there's nothing you need to comment about that. But wasn't the loss of job the very fact that we were reversed in Coon? Remember, Coon was the, well, it's hard to forget Coon, right? It was the Allied Riots and Rodney King and all that. And Coon, you recall, was the officer, Coon and Powell were the officers. And what the Supreme Court said in that case, if I remember correctly, is that the loss of career, the loss of job, is in fact the kind of factor that would, under the old rigid scheme, merit a downward departure. That would be the kind of factor the court could take into account in making a downward departure. So my question is, you're probably anticipating what I'm getting at, but just so I articulate it, if loss of career and loss of job is a kind of factor that under the old scheme would have merited a downward departure, and as you recall, you probably remember the old system, right? You were probably an assistant U.S. attorney back then, right? Yes, for five years now. But you remember the pre-Booker system? Yes, Your Honor. Departures were very hard to get. Downward departures were very hard to get. And so if the Supreme Court tells us that this is the kind of thing that would have merited a downward departure under the old rigid system, why isn't this then a factor that's sufficiently serious that the district court had to articulate or address expressly? Your Honor, I apologize. I didn't read Kuhn in preparation for today, but if I may, in relation to you. It popped to my mind when you gave your answer, so I didn't read it before today either. We're in somewhat the same boat. Fair enough. In response to your description of the case, it seems to me that in a case like Kuhn, where there was such national attention and the police officers were subject to such deserved scorn and ridicule and loss of career, there are a number of factors playing in that aren't present in this case. And in this case, it goes without saying that a branch manager who chooses to commit a fraud on her own bank is going to lose her job. It's the natural consequence of the action she chose. But that is no less the case with a police officer who beats a citizen. You expect that that officer, and after being criminally convicted for that offense, is not going to come back to the police department and get his job back. I mean, I would hope Kuhn is not today on the LAPD, just as I would hope that when Ms. Cameron gets out of prison that she's not rehired by her bank. Those things are pretty much tied to the conviction. You expect to lose your job as a policeman for beating suspects, and you expect to lose your job as a bank officer for committing fraud on the bank. I'm, let me just make, the district judge did not address this point at all. You agree with that? I do agree with that. And not even in questions or, I mean, you had an argument as to the rest of the issues that said, well, you know, we can see what was going on in the district judge's mind by the fact that he at least considered these issues by asking questions. There was nothing like that as to the loss of career. That's correct, Your Honor, and I respect the point that you make in reference to the Kuhn case. But it does seem that, particularly in a case where the fact that she is a branch manager plays into the calculation of her guideline sentence because she abused her position of trust, it seems that the guidelines do take into account the fact that her position is implicated. And it seems that the judge has to take responsibility for the loss of career. In terms of just another minute on this point, was it raised below? I'm sorry? Was this point raised below? Was a judge asked to take this factor into account? The fact that she lost her job? Yes, it was raised below. And how was it raised? Do you recall? The defense raised the argument that she had a promising banking career that was now destroyed. I didn't mean that. Oh, I'm sorry. I mean, was it in open court, spoken by counsel? Was it in a brief sentencing brief? I mean, if you don't know, that's fine. I'm just wondering if you do know. I do know it was in open court. I don't recall at the moment if it was also in her briefs. So at the sentencing hearing, defense counsel stands up, presumably, and addresses the court and says one of the things the court ought to take into account is that she lost her job. And the judge says nothing at that point and doesn't mention it again at the time he pronounced the sentence. I believe that's correct. It was listed as one in connection with the list of factors that he believed that the defendant was naive, she was trusting, she lost her job, she terminated a pregnancy, her friends and family love her, et cetera. So the court at that point did not parse out the list of reasons given, had addressed what she fronted as her two primary arguments, the minor role, and then the fact that she was naive and trusting and taken advantage of and did not address the remaining arguments that were listed at the end. And you mentioned there were two sentencing hearings? There was. At the first one, the defendant led her argument primarily with the idea that she was not guilty. And if in the alternative the court still found that she was guilty, that she was a minor player and got into such detail of the facts of the case, which had occurred a year prior, that the court asked for further briefing to set forth all of the facts of conviction and then put over the sentencing hearing two months. So there was extensive briefing at that point, argued both under the guidelines and the 3553 factors, and then there was an eight-page dialogue between the district court and the defendant before he pronounced sentence. It was a confusing time in district court at the time. It was, Your Honor. As Martinez remembers. As I remember, I had a sentencing or two myself I was handling, and it was a very confusing time. Okay. I don't know whether there are any follow-up questions. If not, we will let you sit down. Thank you, Your Honor. Thank you for your time. Okay. Mr. Tanaka, you have a minute, 44. We'll make it an even three minutes because we've taken some additional time with opposing counsel and see how you get with this. Thank you, Your Honor. Counsel, actually, I would like you to address the sentencing questions that have been raised also here. Booker does not require that the Court articulate any specific things on the record. Booker requires the Court consider the 3553A factors, correct? That's correct. So from the record, we can tell that that consideration took place. For example, giving a sentence here that is half a year below the bottom of the advisory range, isn't that sufficient? No, Your Honor, because, as you know, Booker tells the Court to consider all the 3553A factors, and although this Court's jurisprudence doesn't require a specific articulation of each factor and how it relates, you know, point by point, it does require some reasoned consideration of the factors that are applicable to this case. We don't know in this case that the Court did that. We know that the Court imposed a sentence that was between the two co-defendant sentences. So we know at least he probably we can speculate, probably reasonably, that he might have considered the disparity, but we don't know whether the judge considered the other factors that Ms. Cameron proposed in terms of a lower sentence. And those are not just the one that Judge Kaczynski was talking about now, the loss of a job, which was in the sentencing position paper and mentioned at both sentencing hearings, because so we have it three times. The Court never gave any indication what it believed about that factor. But by the same token, the defense also proffered that after the defense, Ms. Cameron had maintained some very good jobs, had gotten her life back together, and lived a totally law-abiding life, which would, under this Court's pre-Booker jurisprudence, might count for post-defense rehabilitation and departure. Well, let me ask you this. Following your argument, then, to its logical conclusion, are you indicating that any time the sentencing judge doesn't specifically articulate the 3553A factors, that any sentence is presumptively unreasonable, regardless of what that is? No. All I'm saying that, but where defense presents compelling or at least arguable factors, and the judge says nothing at all about them, and doesn't even give a blanket statement that he's considered these types of factors and rejected them, then there's nothing for this Court to review in terms of reasonableness. All you can do is guess that he did that. There's nothing on this record that says, this judge considered the arguments that Ms. Cameron made on behalf, under 3553A, with respect to the histories and characteristics of this. What if the judge had said, you know, I've articulated some factors, and I, of course, I've read all the papers, I've heard the arguments of counsel, and I would state for the record that I've considered everything else. Would that have been enough? That would probably be enough, dependent on what he had said prior to that. I mean, certainly that wouldn't be enough. I mean, I'm holding everything else constant, so we don't have to guess about what he had said earlier. So I'm saying, let's say he had said exactly what he said here, but then at the end he had said, well, in case I've forgotten to mention anything, I just want to assure everybody on the record that I've considered everything else that was raised. I would think that would be enough, Your Honor. It seems sort of pointless, doesn't it? I mean, it's sort of like a Gregorian chant. Perhaps. So the incantation of that, so long as the judge says the magic words, it's fine. I mean, either we think the district judge has considered, or we think the district judge, in which case, you know, we look at the record and see how engaged he is and say, you know, the district judge is obviously engaged in the case. He's considering issues, thinking about it, in which case we don't need him to say an incantation at the end. Or what's the point? I mean, if the judge sits there like a stone statue and then at the end says, the sentence will be 30 months, and by the way, I've considered all the factors. I mean, I don't know. As Your Honor said, stated earlier, there well could be surprises. It could be that if we send this case back to Judge Wilson and it's pointed out to him that he didn't say anything, ever, about two significant arguable post-pre-Booker departure grounds that argued convincingly for a lower sentence, he would say, you know what, you're right. Now that you bring that up to me, I think that she deserves less time. You know, I'm taking another look at the factors and I think she deserves more time. You could say that, right? It's possible he could say that. I think unlikely on this record, but the point is that without any statement at all, this Court really has no way of revealing that. We don't know whether he did consider it. We can guess that he considered it. It does put district judges in a somewhat difficult situation if the defendant lists a whole catalog of factors, some of which are trivial, some of which are nonsensical, some of which are highly unpersuasive. And, you know, really the heart of the case may turn on two or three factors, and yet you know, she raises in this case, you know, I had a, I had, you know, she had this problem with her pregnancy. I sort of don't get how that helps other than to sort of evoke sympathy, and maybe, maybe it did, but I don't know what the district judge can say about that or should say about that or needs to say about that. I think the decisions of this Court over the last six months have made the task much clearer. This was, this was before then. But it's clear that the judge doesn't have to address every single factor, but the judge does have to give some indication of a reasoned consideration of all the factors that are applicable to this case. There has to be some basis for this Court to review the basis of the sentence. And like I said, there's no magic words, but there has to be something. Kennedy. Let me follow up on General Martinez's question that he asked, especially of, of, he asked of, of the prosecutor, and that is, you don't think that by going to the sentencing grid, inherently the Court has taken into account those factors. I mean, there are factors that go into account to make up the grid, both in terms of severity of offense and offense, I mean, offense conduct and, and prior record. And so inherently the, the, the grid takes into account a number of factors. And doesn't the fact that the judge just stays within the grid or maybe goes below the, the, the grid, doesn't that tell us that those factors have already been taken into account? No. That, that was the whole point of, of Booker, I believe. Otherwise, we could just say the guidelines are, is not. I, I, I, whatever Booker said, I can assure you Booker did not say that. That was not the point of Booker. Or this Court's, this Court's decision in Zavala which says that we don't take the guidelines, that's the presumptive sentence. Zavala's not final. Okay. Well, we said, you said that. Zavala's was certainly not final. So I understand the argument from Zavala. Hurricane Trail which said that we take the guidelines as the starting point. The guidelines cannot be the be-all and end-all. That does not help you because to say we take the guidelines as a starting point merely says, well, the judge can, can freely depart. But they are a starting point for a reason. One of the reasons they are a starting point is that they factor in a number of factors. About factors about the defendant herself and about the crime. And I'm, you know, I, I, I think there's some, I mean, considerable wisdom to what I understood to be Judge Martinez's question is when the judge goes to the grid, I mean, the judge sort of plucks a sentence out of the air. You say, well, okay, he has to give us a pretty good reason as to why he gets a sentence. But when he starts with the grid, I'm just wondering, hasn't he already taken into account all the factors that go into making up the, the, the, the sentencing grid? Isn't it, does he have to go over, does he have to go over it again? Does he have to say, oh, she has, you know, such a record? I mean, does he have to go through the, the whole? Katyala, where the grid and the guidelines account for all the arguments, all the significant arguments that defense has proffered in support of a lower sentence, then perhaps it's sufficient to say that these are accounted for by the guideline sentence and maybe some explication of why. But merely to use the guidelines and then the grid and then assume that that accounts for all those factors, I think, is wrong. There's nothing about that, that grid that necessarily encompasses all the 3553A factors. So, Mr. Tanaka, is that really the thrust of your argument, then, that, that what you want is you want the sentencing judge to specifically address the factors that are brought up by the defense? Is that what you're saying? At least make reference to them in some, in some manner. At least show some recognition that this argument was made and that the judge considered it. On this record, we cannot know whether the judge considered it. We can guess. But if the judge asks questions about it, then you, I mean, that, that certainly tells us the judge considered it, right? If, yeah, but I, I really have not very much quarrel with Ms. Ryan's argument with respect to the minor role. I mean, clearly the judge considered and rejected that. You can tell by the questions. But with respect to a large number of the other factors, particularly what might be characterized as post-defense rehabilitation and the loss of her job, there's nothing that indicates that the judge ever considered that. There's no questions, there's no engagement. These factors are mentioned a number of times, and they just sailed right on by. There's no consideration. Thank you. Cages, I will stand submitted. Thank you both, counsel, for a very helpful argument.
judges: Kozinski, Gould. Martinez